UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Aidan A. Smith,<br>　　*Plaintiff*,<br><br>　　　v.<br><br>Michael Hogan, et al.,<br>　　*Defendants*. | Civil No. 3:10cv1025 (JBA)<br><br><br><br>September 22, 2011 |

RULING ON MOTION TO DISMISS

On November 5, 2010, Plaintiff Aidan A. Smith filed an Amended Complaint against officials and former officials of the University of Connecticut ("the University") and of the State of Connecticut ("the State"), as well as the University and the State. Plaintiff claims that in discharging him from the University's Dining Services, the University Defendants violated the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990 by discriminating against the Plaintiff because of his disabilities. Plaintiff further claims that the University and the State officials' conduct violated Plaintiff's rights under the First, Fourth, Fifth, and the Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1988. In addition, Plaintiff claims corresponding state law causes of action. The Plaintiff prays for injunctive, declaratory and monetary relief. Defendants move [Doc. # 23] to dismiss the Amended Complaint in its entirety pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons stated below, Defendants' motion to dismiss will be granted.

I.　　Factual Allegations

Plaintiff Aidan A. Smith alleges as follows. He has Bipolar Disorder, Learning Disability, Attention Deficit Disorder, Post Traumatic Stress Disorder, and a history of

suicide attempts or suicidal ideation. (Am. Compl. ¶ 12.) He also has a history of bronchitis. (*Id.* ¶ 23.) He worked at the University's Dining Services as a student employee and his employer was aware of his impairments. (*Id.* ¶¶ 3, 10, 13.) Plaintiff's high school special education teacher and his father both met with University employee managers during Plaintiff's employment and discussed his special needs. (*Id.* ¶¶ 16–18.) Plaintiff "successfully maintained" his employment until immediately before his dismissal. (*Id.* ¶¶ 18–19.)

Plaintiff alleges in his Amended Complaint that on September 14, 2009, while working a food serving shift "he had been feeling ill while on the food line and feared his bronchitis was re–occurring." (*Id.* ¶ 22.) He also alleges that his treating pediatrician, Dr. Ronald Kelly, believes that he likely suffered from a recurrence of bronchitis on September 14, 2009. (*Id.* ¶ 23.) Supervisory staff told Plaintiff to leave to get a face mask, but because he felt ill and worried about his bronchitis, "he did not return to the food serving worksite but immediately cell phoned managers and left a message within the hour." (*Id.* ¶ 22.) Plaintiff cites Connecticut Department of Public Health Code section 19–13–B42(r) in his Amended Complaint, which he claims prohibited him "from returning to the food serving line with bronchitis." (*Id.* ¶ 23.) He also claims that at the time there was an H1N1 epidemic, and the University had posted signs in dining halls that employees did not need doctor's excuses if feeling too ill to work. (*Id.* ¶ 25.) The University thereafter terminated his employment "because he left a food serving shift without prior supervisory permission while ill." (*Id.* ¶ 21.)

In describing the circumstances surrounding his departure from the food line on September 14, 2009, his subsequent firing, and his physical condition at that time, Plaintiff's

Amended Complaint refers only to his bronchitis as the reason he felt ill and left his work station. He does not allege that his illness or departure had anything to do with post traumatic stress disorder or any other anxiety–related disability. However, in an affidavit attached to his Amended Complaint, Plaintiff states that on September 14, 2009, he was asked to work on the salad line which was "a high anxiety performance task for me since I had had little training at that task." (Ex. C to Am. Compl. at 13.) Plaintiff claims in the affidavit that he requested to be reassigned to another task but the request was denied. (*Id.*) Shortly after that, according to the affidavit, Plaintiff felt sick to his stomach and went to the bathroom, where he started to heave, and then left his work area and called the student supervisor's office on his cell phone. (*Id.*)

Plaintiff requested an internal university hearing; at the October 9, 2009 hearing, the hearing officer held that his termination was consistent with the university policy requiring employees to notify supervisors before leaving a work site. (*Id.* ¶ 29.) Plaintiff requested a "second step grievance hearing" from "Assistant Attorney General at University of Connecticut" Ralph Urban, which was denied. (*Id.* ¶ 32.) Plaintiff's father, Attorney Arthur Smith, who represents him in this matter, contacted the University President's Office concerning University policy and health codes and received a response that "UConn takes matters of public health very seriously and that UConn's policy is to abide by all regulations of the Department of Public Health." (*Id.* ¶ 33.)

Attorney Smith requested information regarding the University Dining Hall Services' policy and pro–active H1N1 procedures pursuant to the Connecticut Freedom of Information Act, and thereafter requested "a Connecticut Freedom of Information ('CTFOI') Commission hearing . . . to challenge the University's failure to comply with the

3

CTFOI Act." (*Id.* ¶ 35.) Before the hearing, Plaintiff's father "had subpoenas duces tecum duly served" on several University officials, including the dining services director, a University's attorney, and the University president. (*Id.* ¶ 37.) Plaintiff alleges that "[o]n February 9, 2010, the defendant's attorney made ex parte contact with the CTFOI hearing officer and requested both a Motion to Quash said subpoenas, and for a Protective Order precluding any additional subpoenaed witnesses"; the motions were granted "without supporting evidence, before the hearing began, and before the Complainant received copies of the Motions." (*Id.* ¶ 38.) Plaintiff's father "was not allowed to ask C. Dennis Pierce, or anyone else at the University, under oath, whether he or anyone had posted, in UConn dining halls, notices that doctor's excuses were unnecessary if dining hall employees felt too ill to work during the H1N1 epidemic." (*Id.* ¶ 39.)

On March 12, 2010, Plaintiff filed a discrimination complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the U.S. Equal Employment Opportunity Commission ("EEOC"). (*Id.* ¶ 41.) On March 29, 2010, the University's Office of Diversity and Equity ("ODE") notified Plaintiff that it had started an investigation into his allegations of discrimination. (*Id.*) The ODE issued its finding on June 23, 2010 to a list of individuals within the University after interviewing university employers and reviewing Plaintiff's employment records. (*Id.* ¶ 42.) The ODE found that Plaintiff's termination "was not related to a disability because he did not have a qualified disability as understood under the ADA and Section 504"; it submitted this finding to the CHRO (*Id.* ¶ 43.) Plaintiff alleges that the finding "contained confidential disability related information." (*Id.*)

On August 6, 2010, the CHRO issued a Merit Assessment Review, finding that the Plaintiff had stated a valid claim for relief and that the CHRO had jurisdiction over the university. (*Id.* ¶ 44.) The CHRO also found that "there is a reasonable possibility that an investigation would result in a finding of reasonable cause against the university." (*Id.*) The Plaintiff received a Release of Jurisdiction from the CHRO and a Notice of Right to Sue from the EEOC. (*Id.* ¶ 51.)

Finally, Plaintiff alleges that his last readmission into the hospital in November 2009 "was attributable, in part, according to discharging documents, to the loss of his employment . . . in September 2009." (*Id.* ¶ 50.) He has also "suffered financial injury and emotional distress because of [the] university actions." (*Id.*)

## II. Discussion[1]

### A. Count I: ADA

To establish a prima facie case of discriminatory discharge under the Americans with Disabilities Act ("ADA"), Plaintiff must demonstrate that "1) he was an 'individual who has a disability' within the meaning of the statute; 2) the employer had notice of his disability; 3) he could perform the essential functions of the job with reasonable accommodation; and

---

[1] The Federal Rules of Civil Procedure require a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and a defendant may move to dismiss a complaint that fails "to state a claim upon which relief can be granted." Fed R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Kuck v. Danaher*, 600 F.3d 159, 162–63 (2d Cir. 2010). A complaint will not survive a motion to dismiss if it relies on "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," or if "the well–pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 129 S. Ct. at 1949–50.

4) the employer refused to make such accommodation." *Parker v. Columbia Pictures Indus.* (*Parker I*). 204 F.3d 326, 332 (2d Cir. 2000).[2] When the first three requirements are satisfied, "failure to make reasonable accommodation . . . amounts to discharge 'because of' his disability." *Id.* "A plaintiff need not demonstrate that disability was the sole cause of the adverse employment action . . . [but] must show only that disability played a motivating role in the decision." *Id.* at 337.

Plaintiff alleges in his Amended Complaint that although the stated reason for his firing was that "he left a food serving shift without prior supervisory permission while ill" (Am. Compl. ¶ 21), he was in fact "terminated because of his disability, or perceived disability" (*id.* ¶ 28). A plain reading in the light most favorable to Plaintiff reveals that the Amended Complaint claims that Plaintiff was terminated because of his bronchitis, or his employer's failure to accommodate his bronchitis. Plaintiff refers to bronchitis as the suspected source of his illness while working the food line and alleges that his treating pediatrician validated his suspicions. (*Id.* ¶¶ 22–23.) He further cites Public Health Code § 19–13–B42(r) as prohibiting him "from returning to the food serving line with bronchitis." (*Id.* ¶ 24.)

---

[2] The standard set out in *Parker* applies only to plaintiffs that require an accommodation in order to perform the essential functions of their job, *see Parker*, 204 F.3d at 332; *Parker v. Sony Pictures Entm't, Inc.* (*Parker II*), 260 F.3d 100, 105 (2d Cir. 2001), whereas the standard set out by the Second Circuit in *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869–870 (2d Cir. 1998), applies to plaintiffs who could work "with or without accommodation" but were nonetheless fired because of their disabilities. Plaintiff's counsel clarified at oral argument that he relies on *Parker* to make his prima facie showing because Plaintiff required accommodation in order to perform his job, therefore the Court will analyze his claim under that standard.

Plaintiff's counsel, however, conceded at oral argument that bronchitis is not a disability within the meaning of the ADA. Instead, in his opposition to Defendants' motion to dismiss and at oral argument, Plaintiff's counsel invoked a new disability that Plaintiff did not mention in his Amended Complaint in connection with his work on the food line, the September 14, 2009 incident, or his subsequent firing: anxiety. Plaintiff argues that he felt sick to his stomach on September 14 because "when his anxiety reaches its high point, an aspect of his disability, he often feel[s] as if he is going to vomit," that the salad line to which he was assigned "was a high anxiety performance task for him," and that he was denied the accommodation of being "placed at another task until he knew [the salad line] better." (Opp'n [Doc. # 25] at 15.) None of these allegations are contained within the Amended Complaint, but can instead be found in Plaintiff's October 9, 2009 affidavit prepared prior to his administrative hearing on that date and appended to his Amended Complaint among 170 pages of attached exhibits but not explicitly referenced or incorporated into the Amended Complaint. (*See* Ex. C to Am. Compl. at 12–15.)

Defendants argue that the Court should not consider these allegations because they are not contained within Plaintiff's Amended Complaint and thus Defendants did not have fair notice of these claims and the grounds upon which they rest.[3] Pursuant to Federal Rule

---

[3] Although the Court may, in certain situations, convert a Rule 12(b)(6) motion to dismiss to a Rule 56 motion for summary judgment when a party seeks to introduce extraneous documents not set forth in the complaint, conversion is inappropriate where, as here, "the non–movant [offers] the supplement submissions, [and] the movants could not have had adequate notice that this motion might be treated as one for summary judgment." *B.V. Optische Industrie De Oude Deft v. Hologic, Inc.*, 909 F. Supp. 162, 167 (S.D.N.Y. 1995).

of Civil Procedure 10(c),[4] a complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991). However, exhibits attached to a complaint which allege "entire legal theories that appear nowhere on the face of the [complaint]" are not properly considered by the Court as included within the complaint. *United States v. Int'l Longshoremen's Assoc.*, 518 F. Supp. 2d 422, 461 (E.D.N.Y. 2007). In addition, for the purposes of Rule 10(c), a "written instrument" is "a document evidencing legal rights or duties or giving formal expression to a legal act or agreement, such as a deed, will, bond, lease, insurance policy or security agreement"; affidavits do not fall within the definition of "written instrument." *Murphy v. Cadillac Rubber & Plastics, Inc.*, 946 F. Supp. 1108, 1115 (W.D.N.Y. 1996) (citing *Rose v. Bartle*, 871 F.2d 331, 340 n.3 (3d Cir. 1989); *Schnell v. City of Chicago*, 407 F.2d 1084 (7th Cir. 1969)) ("This court can find no decision allowing a plaintiff's own supporting statements to be considered part of the pleadings on a motion to dismiss. Thus plaintiffs' affidavits, the attorney's affirmation, and JM's letter of resignation are not 'written instruments' within the meaning of Rule 10(c)."); *see also Int'l Longshermen's*, 518 F. Supp. 2d at 465–66 ("The pleadings attached as exhibits to the Amended Complaint are functionally no different than the affidavits held not to be 'written instruments' in Murphy and Rose—they are nothing more than self–serving statements prepared by the plaintiff with no independent evidentiary value. They therefore shall not be deemed a part of the Amended Complaint pursuant to Rule 10(c).").

---

[4] Rule 10(c) reads: "A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion. A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."

8

In opposing Defendants' motion to dismiss, Plaintiff seeks to rely on his affidavit, which, by claiming his anxiety formed the basis of his disability and accordingly the discriminatory discharge rather than bronchitis described in his Amended Complaint, puts forth a new legal theory that appears nowhere on the face of his Amended Complaint. Because it would be improper for the Court to construe his affidavit as a "written instrument" under Rule 10(c), *see Murphy*, 946 F. Supp. at 1115, or to entertain the legal theory espoused in his affidavit but appearing nowhere on the face of the Amended Complaint, *see Int'l Longshoremen's*, 518 F. Supp. 2d at 461, the Court will not consider Plaintiff's October 9, 2009 affidavit as a part of his Amended Complaint.

Therefore, the Amended Complaint, construed in the light most favorable to Plaintiff, alleges only that the University refused to accommodate his bronchitis and thereafter terminated him because he could not perform the essential functions of his job without accommodation.  As Plaintiff's counsel conceded that bronchitis is not a disability within the meaning of the ADA, Plaintiff has failed to satisfy the first prong under *Parker*, 204 F.3d at 332, that he is an individual with a disability within the meaning of the statute. He cannot therefore establish a prima facie case of discriminatory discharge and his ADA claim is dismissed.

B. Count II: Rehabilitation Act

Section 504 of the Rehabilitation Act prohibits agencies receiving federal funding from discriminating against individuals with a disability "solely by reason of her or his disability." 29 U.S.C. § 794. As discussed above, Plaintiff's Amended Complaint alleges only that the University terminated him because of his bronchitis, which his counsel agreed is not

9

a disability. Because Plaintiff has failed to allege a disability, his Rehabilitation Act claim is dismissed.

      C.      Count III: First Amendment

Plaintiff alleges that in quashing his father's subpoenas, Defendant Valicia Harmon, a Connecticut FOIC hearing officer, violated Plaintiff's First Amendment rights by imposing a prior restraint on the public forum. Defendants argue that Plaintiff lacks standing to challenge Harmon's actions in the FOIC proceeding because he was not a party to that proceeding; rather his father who participated in that proceeding and his father's First Amendment rights are implicated by actions taken in the course thereof. Plaintiff responds that he has third–party standing to assert the First Amendment claim on behalf of his father.

A plaintiff who seeks to assert the claims of another person may satisfy third–party standing "where the plaintiff can demonstrate (1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 109 (2d Cir. 2008). Here, Plaintiff is unable to demonstrate a barrier to his father's ability to assert his own First Amendment rights. He claims that he is "protecting the rights of the father representing him, to avoid putting the father in any position that might create a professional attorney/client conflict of interest." (Opp'n at 17–18.) This conclusory pronouncement fails to put forth a plausible explanation as to why Plaintiff's father, an attorney, cannot bring his own separate action for the alleged violation of his First Amendment rights. Plaintiff is accordingly unable to show that he has standing to bring this First Amendment claim on behalf of his father. The First Amendment claim in Count Three of the Amendment Complaint is therefore dismissed.

### D. Count IV: Fourth Amendment Privacy

Plaintiff alleges that Defendant McGee, Director of the ODE, violated his Fourth Amendment rights of privacy by conducting an investigation into Plaintiff's allegations of discrimination—after Plaintiff filed complaints with the CHRO and EEOC—and publishing private information related to the matter without Plaintiff's permission. (Am. Compl. ¶¶ 41, 44–45.)

#### 1. *The Investigation*

Defendants argue that Plaintiff could not reasonably expect that his employer would refrain from reviewing his employment records after he raised allegations of employment discrimination. Nor could he have a reasonable expectation of privacy in his employment records, which were owned and maintained by the University. Plaintiff contends that the ODE is not statutorily authorized "to watchdog the compliance of other state agencies or operations," and therefore overstepped the boundaries of its authority when it investigated allegations of employment discrimination against the University's Dining Services.

Plaintiff's "Fourth Amendment rights are implicated only if the conduct of [Defendants] in this case infringed an expectation of privacy that society is prepared to consider reasonable." *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987). "[P]ublic employer intrusions on the constitutionally protected privacy interests of government employees for noninvestigatory, work–related purposes, as well as for investigations of work–related misconduct, should be judged by the standard of reasonableness under all the circumstances." *Id.* at 725–26.

The Amended Complaint contains no factual matter to support Plaintiff's threadbare claim that the ODE's investigation violated his Fourth Amendment right to privacy.

11

Although he argues in opposition to Defendants' motion to dismiss that the ODE had no authority to investigate whether or not Plaintiff was discriminated against, he provides no support for this position, and he does not allege any facts in his Amended Complaint that suggest the search, interviews, or other investigative efforts by the ODE were unreasonable. Plaintiff's Fourth Amendment claim based on the ODE's investigation is therefore dismissed.

### 2. *Publication of Private Information*

Plaintiff also claims that Defendant McGee violated his right to privacy when the ODE "published private employment and disability information without [his] permission and statutory authority to do so." (Am. Compl. ¶¶ 44–45.) He supports this claim only with the allegations that the ODE finding "contained confidential disability related information" (*id.* ¶ 43), and that it was issued to the following list of individuals, in addition to being submitted to the CHRO:

> [Michael] Csere, a student manager; Jim Rogers, a Dining Services Assistant Manager; Scott Harmon, a Director of Retail Operations; Dennis Pierce, the Director of Dining Services; Michael Eagan, an Employment Specialist/Attorney General Designee of the University; Annie Noonan, Assistant Executive Director of UCPEA; Jackie Soroka, Administrative Financial Aid Office Manager; Dana McGee, Associate Vice President of the ODE; and [Joseph] Sassi, ODE Director of Institutional Case Management.

(*Id.* ¶ 42.)

The privacy rights of an individual include the "individual interest in avoiding disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 599 (1977). This notion of privacy extends to information regarding the status of a person's health, *Doe v. City of New York*, 15 F.3d 264 (2d Cir. 1994), including information about his or her psychiatric health.

*O'Connor v. Pierson*, 426 F.3d 187, 201 (2d Cir. 2005). However, not all personal medical information falls within the realm of constitutionally protected privacy, and "the interest in the privacy of medical information will vary with the condition." *Matson v. Bd. of Educ. of the City Sch. Dist. of N.Y.*, 631 F.3d 57, 64 (2d Cir. 2011) (quoting *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999)). In *Matson*, the Second Circuit upheld a Rule 12(b)(6) dismissal of a privacy claim where the plaintiff alleged that the defendants violated her constitutional right of privacy by publicly disclosing her medical condition of fibromyalgia. *Id.* at 58, 61. The court reasoned that unlike the HIV infection in *Doe,* fibromyalgia was not a fatal disease that "carr[ies] with it the sort of opprobrium that confers upon those who suffer from it a constitutional right of privacy as to that medical condition" and that revealing the condition of fibromyalgia would not "expose a person . . . to discrimination and intolerance." *Id.* at 67 (quoting *Doe*, 15 F.3d at 267) (internal quotation marks omitted).

Plaintiff here alleges only that the distributed ODE finding incorporated "confidential disability related information." (Am. Compl. ¶ 43.) This threadbare allegation contains no factual matter that would plausibly suggest that the finding included any medical information about Plaintiff that would carry any sort of opprobrium or subject Plaintiff to discrimination or intolerance. *See Matson*, 631 F.2d at 67. Plaintiff's Fourth Amendment claim based on the distribution of the ODE finding is therefore dismissed.

    E.    Counts V and VI: Fifth and Fourteenth Amendments

The Amended Complaint claims that the ODE's investigation and the distribution of its findings violated Plaintiff's Fifth Amendment rights against self–incrimination. (Am. Compl. ¶ 44.) Plaintiff also claimed in his opposition to Defendants' motion to dismiss, and

13

his counsel claimed at oral argument, that the disclosure of his private information violated the due process clauses of the Fifth Amendment and Fourteenth Amendments as well.

### 1. *Fifth Amendment Self–Incrimination*

The Fifth Amendment provides in part that no person "shall be compelled in any criminal case to be a witness against himself." The sole concern of this privilege "is to afford protection against being forced to give testimony leading to the infliction of penalties affixed . . . criminal acts." *Kastigar v. United States*, 406 U.S. 441, 453 (1972) (internal quotation marks and citations omitted); *see also Higazy v. Templeton*, 505 F.3d 161, 170 (2d Cir. 2007). The Amended Complaint contains no allegation that Plaintiff was in any way compelled to testify against himself at any point in time. Because "[t]he Constitution explicitly prohibits compelling an accused to bear witness 'against himself' [and] does not proscribe incriminating statements elicited from another," *Couch v. United States*, 409 U.S. 322, 328 (1973), Plaintiff's allegation that the ODE finding included "incriminating documents," without any allegation that Plaintiff was compelled to testify against himself in the course of preparing those documents, fails to state a claim for self–incrimination in violation of the Fifth Amendment.

### 2. *Substantive Due Process*

Plaintiff claims that Defendants' actions deprived him of his substantive due process rights under the Fifth and Fourteenth Amendments. The substantive due process right "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). It protects only "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Id.* at 720–21 (noting that the liberty rights protected by the

substantive due process clause include the right to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion) (internal quotation marks and citations omitted); *see also Kia P. v. McIntyre*, 235 F.3d 749, 758 (2d Cir. 2000).

As elaborated in his opposition to Defendants' motion to dismiss and explained by counsel at oral argument, Plaintiff claims that Defendants' actions interfered with his liberty and property interests in complying with Connecticut Health codes, in the informal "second step" grievance hearing that he requested of the University's Assistant Attorney General, and in his employment with the University. None of these claimed interests bears the hallmarks of fundamental rights and liberty interests deeply rooted in the Nation's history and tradition sufficient to warrant protection under the substantive due process clauses of either the Fifth or Fourteenth Amendment. *See Glucksberg*, 521 U.S. at 720–21. Complying with health codes, informal employment grievance hearings, and at–will employment are not fundamental and deeply rooted liberties comparable to the right to marry, the right to have and raise children, or the right to bodily integrity. *See id.*

Similarly, to the extent Plaintiff claims a property, rather than liberty interest in the grievance hearing or his employment, he does not allege a property interest cognizable under the due process clause. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972) (respondent did not have a property interest in his employment with Wisconsin State University–Oshkosh beyond the end date specified in his employment contract); *see also Velez v. Levy*, 401 F.3d 75, 85 (2d Cir. 2005) ("[O]nly where

15

a plaintiff can demonstrate that state law confers 'a legitimate claim of entitlement' to a particular position will a property interest in that position arise."). Plaintiff does not allege in his Amended Complaint that any state law conferred a legitimate claim of entitlement to his position with the University or to the second-step hearing of which he claims he was deprived. As Plaintiff has failed to state a constitutionally cognizable liberty or property interest, his due process claims in Counts Five and Six are dismissed.[5]

### F. Counts VII through XI: Section 1988 and State-Law Claims

Count Seven of Plaintiff's Amended Complaint alleges violations of 42 U.S.C. § 1988 and Counts Eight through Eleven allege violations of Connecticut state law. Section 1988 permits the Court to allow the prevailing party in a Section 1983 action reasonable attorney's fees. It "does not create a separate action for attorney's fees. An award of fees may be made only as to 'the prevailing party . . . as part of costs' recovered in the underlying case." *Brown v. Gen. Motors Corp., Chevrolet Div.*, 722 F.2d 1009, 1012 (2d Cir. 1983). Therefore, because the Court dismisses all of Plaintiff's claims under Section 1983, his Section 1988 claim is also dismissed.

With respect to Plaintiff's state-law claims, as supplemental jurisdiction is a matter of discretion, the Court need not exercise supplemental jurisdiction in every case, and "needless decisions of state law should be avoided." *United Mine Workers of Am. v. Gibbs*,

---

[5] Plaintiff states in his opposition to Defendant's motion to dismiss that Defendants "have not raised objections to the Plaintiff's Complaint allegations of Equal Protection Clause violations under the 14th Amendment." (Opp'n at 22 n.8.) However, despite Plaintiff's argument that Defendants waived objection to his equal protection claim, nowhere in his Complaint does he allege that Defendants violated the equal protection clause of the Fourteenth Amendment. The Court therefore does not read the Amended Complaint to contain such a claim.

16

383 U.S. 715, 726 (1966).  "[I]f the federal claims are dismissed before trial . . . the state claims should be dismissed as well."  *Id.*; *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004).  Plaintiff's state–law claims are therefore dismissed.

III.     Conclusion

For the reasons stated above, Defendants' motion [Doc. # 23] to dismiss is GRANTED.  The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 22nd day of September, 2011.